Anthony P. Robino and Edna S. Robino v. Commissioner.
Robino v. Commissioner
Docket No. 1497-67.
United States Tax Court
T.C. Memo 1969-269; 1969 Tax Ct. Memo LEXIS 27; 28 T.C.M. (CCH) 1359; T.C.M. (RIA) 69269; December 11, 1969, Filed. *27 Herbert W. Christenberry, Jr., Nat'l Bk. Commerce Bldg., New Orleans, La., for the petitioners. Robert S. Leigh, Jr., for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax as follows: Year
Deficiency
Additions to Tax, Sec. 6653(b), I.R.C. 1954
1960
$17,373.53
$ 8,686.77
1961
23,673.23
11,836.62
1962
5,947.64
2,973.82 At the trial respondent conceded the additions to tax and then, with leave of Court, filed an amended answer alleging an increased deficiency in income tax for 1962 in the amount of $2,761.49. Certain issues have been settled by the parties. The remaining issues, all of which involve the application of the net worth increase and nondeductible expenditures method of income reconstruction, are: (1) What amount of cash, if any, did petitioner have on hand, exclusive of savings accounts, on January 1, 1960. (2) Whether the net assets of Frieda's Parisienne, a nightclub, should be included in petitioner's net worth as of December 31, 1962. (3) Whether the increase in petitioner's net worth from December 31, 1959, to *28 December 31, 1962, should be allocated equally to each of the three tax years 1960, 1961, and 1962. Findings of Fact Anthony P. and Edna S. Robino, husband and wife during 1960, 1961, and 1962, were legal residents of New Orleans, Louisiana, at the time their petition was filed. They filed their joint income tax returns for 1960 through 1962 with the district director of internal revenue at New Orleans. Anthony P. Robino will be referred to as petitioner. Petitioner was married to his first wife, Eva, in 1940. From 1940 to 1950 they lived in a duplex apartment owned by Eva's mother, to whom petitioner paid rent of $5 per month plus a share of the utility bills. During this period he was employed in the local shipyards. In 1951 he was divorced and thereafter, for a period of time prior to 1956, worked as a bartender. In January 1956 petitioner leased the premises of a nightclub known as Guys and Dolls, purchased the furniture, fixtures, and equipment used in the club, and began operating it. The gross receipts from Guys and Dolls, and two similar businesses (Frieda's Parisienne and Chez Paree) which petitioner subsequently acquired and operated, were derived principally from *29 the sales of beverages to walk-in customers. During periods in which entertainment was provided, the prices of drinks were increased. From 1956 to 1958 petitioner lived in a room above the business premises of Guys and Dolls and paid no rent. In 1958 he married his present wife, Edna, and in February of that year purchased for $29,500 a residence located at 6061 Paris Avenue in New Orleans. Between that time and December 31, 1959, he had improvements made to this property, consisting of a swimming pool at a cost of $4,700 and iron grillwork at a cost of $1,200. On January 29, 1960, petitioner purchased a residence at 16 Park Island Drive, paying $20,000 in currency and assuming a mortgage having a balance due of $38,000. The $20,000 of currency had not been borrowed by petitioner from any lending institution or withdrawn by him from his checking or savings accounts. On May 14, 1960, petitioner sold Guys and Dolls for a cash consideration of $20,000. On his income tax return for 1960 he reported net profit of $2,232.79 from the operation of Guys and Dolls for the period January 1, 1960, to May 14, 1960, as well as a long-term capital gain of $13,183.17 realized on the sale of *30 the business. On September 1, 1960, petitioner acquired the nightclub known as Frieda's Parisienne, 1360 located at 231 Bourbon Street. Petitioner paid the former tenants $12,000 for the business and subleased the premises from Antonio Bologna for a term of four years, one month. The sublease also covered the furniture, fixtures, and equipment and gave petitioner an option, for a period ending August 1, 1964, to purchase them for $31,800. In the event of the exercise of the option, all payments of rent on the furniture, fixtures, and equipment were to be credited against the purchase price of $31,800, the balance to be paid in cash upon execution of the act of sale. During 1960 petitioner expended $2,401.26 for additional furniture, fixtures, and equipment. Both parties have computed the tax as if the option were exercised sometime in 1960. In his income tax return petitioner treated the transaction as an outright purchase of the furniture, fixtures, and equipment, for which he had paid $12,000 to the former tenants and incurred a liability to Bologna of $31,800. In determining the disputed deficiencies respondent treated the entire consideration of $46,201.26 ($12,000 plus *31 $31,800 plus $2,401.26) paid and agreed to be paid for the business and assets of Frieda's Parisienne as the cost of the furniture, fixtures, and equipment. On or about January 1, 1961, petitioner acquired the nightclub known as Chez Paree, located at 410 Bourbon Street, agreeing to pay $4,724 for the furniture and fixtures. He contemporaneously purchased and installed an air-conditioner for $2,069.69. On May 3, 1961, petitioner entered into a contract for the purchase of the land, building, and improvements (including the furniture and fixtures acquired on January 1, 1961) used for Chez Paree, for a recited consideration of $100,000. Of the purchase price, $95,276 was allocable to the land, building, and improvements and the balance of $4,724, consistent with the agreement of January 1, 1961, to the furniture and fixtures. Petitioner paid $59,460 of the purchase price in cash and gave a note in the amount of $40,540 for the balance. Petitioner thereafter operated the business continuously through December 31, 1962. By this date the balance due on the note had been reduced to $27,199.32. During 1961 petitioner entered into various transactions which made funds available to him *32 for the purchase of assets. He borrowed approximately $20,000 from American General Savings & Loan Association, using his Paris Avenue residence as security. He borrowed $6,400 from his sister-in-law, Mabel C. Barber, and still owed this amount as of December 31, 1961. In addition, he sold some stock in the Bank of Louisiana for $9,375. On January 1, 1962, petitioner sold Frieda's Parisienne to Raymond Lindsey for $2,000 in cash and a note for $10,000, plus assumption of petitioner's sublease and debt to Bologna - on which about $22,200 was then due - for the movable property, fixtures, and equipment. Petitioner and Lindsey entered into a written agreement providing for a sublease of the premises at 231 Bourbon Street for a period beginning January 1, 1962, and ending September 30, 1964. The sublease was expressly made subject to the terms and conditions of the prior sublease between Bologna and petitioner. Lindsey operated Frieda's Parisienne during most of 1962, holding all appropriate licenses and permits in his name. However, he encountered financial difficulties, and during November and December 1962, petitioner paid the city sales and amusement taxes covering the operations *33 of Frieda's Parisienne for the months of October and November 1962. These payments, made by checks drawn on his account with the Bank of Louisiana and payable to the City of New Orleans, were as follows: Date ofCheck
Amount ofCheck
Issued in Payment of
11/6/62
$102.22
October 1962 Amusement Tax
11/6/62
45.04
October 1962 Sales Tax
12/1/62
84.18
November 1962 Amusement Tax
12/1/62
39.44
November 1962 Sales Tax
Prior to the end of 1962 Lindsey advised petitioner that he was unable to meet his obligations, and sometime during the month of December he left the business and departed from New Orleans. Petitioner then took over the business. Petitioner received full credit for all payments made by Lindsey against the purchase price of the assets pursuant to the sublease with Bologna. During 1962 petitioner made representations to a financial institution that he owned an equity interest in a partnership operating Frieda's Parisienne; however, in fact, Lindsey was neither his partner nor his agent. The cash receipts from the businesses of Guys and Dolls, Chez Paree, and Frieda's Parisienne were not all deposited by petitioner during his ownership and *34 operation thereof during 1960, 1961, and 1962. As a general rule, he deposited in the respective 1361 bank accounts of the businesses only sufficient daily sales receipts to cover checks drawn thereon. The balance of the daily receipts was retained, undeposited, to pay many of the operating expenses of the businesses, as well as petitioners' personal expenses, and to make capital investments. On March 22, 1962, petitioner sold his Paris Avenue residence to Malcolm Faber for $43,500. Since Faber did not have cash with which to make a down payment, he gave petitioner a note in the amount of $12,000, payable in installments of $300 per month, and assumed the outstanding mortgage. Faber had lived in the house for several months prior to the sale, and he was given credit on the note for the rental payments that he had already made. As of May 14, 1962, the balance due on the note was $8,400. By December 31, 1962, the balance had been reduced to $6,000 ($8,400 less payments of $300 per month for the period May through December 1962). Petitioners reported the following amounts of taxable income and tax liabilities on their returns filed for the years 1960 through 1962. axLiability Reported
3rted
1960
$ 7,603.55
$1,808.80
1961
21,841.22
6,195.66
1962
8,632.72
2,609.91
*35 In the notice of deficiency respondent used the net worth increase plus nondeductible expenditures method to reconstruct petitioners' taxable income for the years 1960, 1961, and 1962. The following table is a condensation of the computation used by respondent in his determination of the deficiencies, adjusted to reflect concessions made by respondent and a $6,000 asset in petitioners' net worth as of December 31, 1962, for a receivable due from Malcolm Faber, which respondent alleged in the amendment to his answer: 1362 ASSETS *10
As of December 31
1959
1960
1961
1962
Cash in bank accounts
$ 8,265.03
$ 7,508.32
$ 23,268.94
$ 17,186.98
U.S. Savings Bonds
1,050.00
2,850.00
Receivable due from Malcolm Faber
6,000.00
Merchandise inventory:
Guys and Dolls
3,110.60
Frieda's Parisienne
1,005.15
1,020.05
877.56
Chez Paree
650.20
1,611.65
Business furniture, fixtures, and equipment:
Guys and Dolls
9,500.29
Frieda's Parisienne
46,201.26
46,201.26
46,201.26
Chez Paree
4,724.00
4,724.00
Chez Paree
2,069.69
3,997.85
Business buildings and improvements:
410 Bourbon Street - building
95,276.00
95,276.00
410 Bourbon Street - improvements
3,592.54
Other real estate:
Residence - 6061 Paris Avenue
35,400.00
35,400.00
35,400.00
Residence - 16 Park Island
58,000.00
58,000.00
58,000.00
Home furniture - purchased in 1961
500.00
500.00
Bank of Louisiana stock
7,000.00
7,000.00
Automobiles
1,450.00
5,200.00
7,378.00
15,200.00
Boat house
4,050.00
4,050.00
4,050.00
Boat
6,000.00
6,000.00
6,000.00
Meter deposits
300.00
300.00
A.G.A.V. deposit
350.00
350.00
Total Assets
$64,725.92
$170,364.73
$286,238.14
$266,717.84
*36 1363 LIABILITIES AND RESERVE FOR DEPRECIATION *10
As of December 31
1959
1960
1961
1962
Notes payable:
A. Bologna & Co.
$29,400.00
$ 22,200.00
$ 15,500.00
F. J. Gisevius for Walter Noto
32,629.96
27,199.32
American General Savings & Loan Association
$15,241.55
12,343.92
31,211.66
Third District Homestead
36,864.62
34,949.18
27,510.68
Mabel C. Barber
6,400.00
15,000.00
Bank of Louisiana
19,222.34
Reserve for depreciation:
Furniture, fixtures, and equipment:
Guys and Dolls
4,080.41
Frieda's Parisienne
1,466.17
6,086.30
10,706.43
Chez Paree
782.87
1,854.96
Building, 410 Bourbon Street
1,000.00
3,000.00
Deposits on sale price of Paris Avenue residence
3,000.00
Total liabilities and reserve for depreciation $19,321.96
$80,074.71
$138,259.97
$119,993.73
NET WORTH
$45,403.96
$90,290.02
$147,978.17
$146,724.11 1364 *10
As of December 31
1960
1961
1962
Increase or (decrease) in net worth $44,886.06
$57,688.15
($ 1,254.06)
Add:
Personal living expenses
$14,691.77
$14,711.17
$13,486.96
Federal income taxes
3,231.92
1,008.80
9,495.66
Unidentified checks:
Frieda's Parisienne
450.00
Chez Paree
605.22
1,236.45
Total additions
$17,923.69
$16,775.19
$24,219.07
Less:
Adjustment for unclaimed depreciation:
Guys and Dolls
($ 408.15)
Nontaxable portion of long-term capital gains ( 6,591.59)
($ 1,187.50)
($ 3,703.07)
Total subtractions ($ 6,999.74)
($ 1,187.50)
($ 3,703.07)
Adjusted gross income as corrected
$55,810.01
$73,275.84
$19,261.94
Adjusted gross income reported on returns 11,603.55
25,841.22
12,632.72
Increase in adjusted gross income
$44,206.46
$47,434.62
$ 6,629.22
*37 1365 Ultimate Findings of Fact Petitioner had on hand $20,000 in currency on January 1, 1960, in addition to the balance in his bank accounts. Petitioner owned the net assets of Frieda's Parisienne as of December 31, 1962. Opinion Petitioner does not contest the use of the net worth increase method in reconstructing his net income, but contends that respondent made three errors, which have not been conceded, in applying the method: (1) Failure to allow petitioner credit for having currency on hand in the amount of $50,000 on January 1, 1960; (2) inclusion of the assets of Frieda's Parisienne in petitioner's net worth as of December 31, 1962; and (3) failure to spread the net worth increase evenly over all three taxable years. [1]
The cash hoard. Petitioner claims that he had a cash hoard of at least *38 $50,000 on January 1, 1960, consisting mainly of $20 and $100 bills wrapped in tinfoil and newspapers and stored in his attic and dresser drawers. These sums were used, he maintains, principally to make the down payment on his Park Island Drive residence in January 1960 and to cover a part of the purchase price of Chez Paree in May 1961. Petitioner contends that respondent's net worth statement is in error in giving him credit for only the balance of $8,265.03 in his bank accounts as of January 1, 1960. Careful study of the entire record convinces us, and we have found as an ultimate fact, that petitioner had a hoard of currency in the amount of $20,000 on January 1, 1960. Twenty-eight days after this date retitioner made a down payment of $20,000 on his Park Island Drive residence. The record is unmistakably clear that he did not borrow this money from a lending institution and did not withdraw it from any bank, and respondent does not seriously contend that petitioner's business could have produced such a large sum between January 1 and January 29, 1960. On this record we are compelled to conclude that petitioner already had this $20,000 on hand at the beginning of 1960. We are *39 not satisfied, however, that petitioner's cash hoard exceeded $20,000. True, during 1960 and 1961 petitioner made cash investments totaling more than $105,000, consisting of the $20,000 down payment on the Park Island Drive residence; $12,000 in September 1960 for Frieda's Parisienne; $2,401.26 in 1960 for equipment for Frieda's Parisienne; $10,050 in 1960 for a boat and boat house; $59,460 in May 1961 for Chez Paree; and $2,069.69 in 1961 for an air-conditioner for Chez Paree. But petitioner had other sources of funds. On May 14, 1960, he received $20,000 from the sale of Guys and Dolls. In 1961 he borrowed $20,000 from the American Savings and Loan Association, using his Paris Avenue residence as security, and $6,400 from his sister-in-law, giving her his personal note. In addition, he sold his stock in the Bank of Louisiana for $9,375. We are not convinced that his cash outlays during 1960 and 1961 were not derived from these sums, totaling $35,775, together with the income from Guys and Dolls prior to May 14, 1960, from Frieda's Parisienne, which petitioner began operating on September 1, 1960, and from Chez Paree, which he acquired on January 1, 1961. These were substantial businesses, *40 from each of which petitioner reported gross receipts at a rate of about $60,000 per year. Moreover, petitioner admitted that the sales made by the former owner of Chez Paree exceeded petitioner's sales through Frieda's Parisienne. Petitioner repeatedly admitted that he did not know how much money he had on hand at the beginning of 1960. During the course of the entire trial he never testified that he had made any count or kept any record of the amount of currency he had. Indeed, he admitted that the $50,000 now claimed to be the amount of the hoard is a computed figure. [2] We hold that the cash hoard did not exceed $20,000. Respondent argues that finding the existence of any cash hoard at all requires the assumption that petitioner *41 understated his income in his returns for 1956 through 1959, and relying upon William G. Lias, 24 T.C. 280 (1955), affd. 235 F. 2d 879 (C.A. 4, 1366 1956), certiorari denied 353 U.S. 935 (1957), contends that no such assumption can be made. However, the facts in Lias are different. There the record contained substantial credible evidence that no cash hoard existed; here the expenditure of $20,000 on January 29, 1960, as a down payment on the Park Island Drive residence is explainable only by finding that petitioner had the money on hand at the beginning of the year. The assets of Frieda's Parisienne. The assets, determined by respondent to be a part of petitioner's net worth as of December 31, 1962, include an inventory of merchandise in the amount of $877.56; furniture, fixtures, and equipment in the amount of $46,201.26 (less a reserve for depreciation in the amount of $10,706.43), and a liability to Anthony Bologna for the balance due on the furniture, fixtures, and equipment in the amount of $15,500. Thus the net amount of the adjustment to net worth is $20,872.39. Petitioner's position on this issue is very simple - he sold Frieda's *42 Parisienne to Raymond Lindsey on January 1, 1962, in consideration of cash and a note and assumption of petitioner's obligations to Anthony Bologna and repossessed the business on January 1, 1963. Thus, petitioner argues, he did not own the business at the end of 1962. [3]
The record supports respondent's determination that petitioner owned Frieda's Parisienne at the end of 1962. Petitioner's payment of the city amusement and sales taxes in November and December 1962 is consistent with his ownership of the business at that time. Such payments, having been made prior to the end of the year, are not explained by the city's requirement that taxes incurred at a particular address must be paid, even by a new owner, before business at that location may be continued. Indeed, Lindsey, petitioner's own witness, testified [4] that he abandoned the business prior to the end of 1962, sometime in December, and we have so found. *43 Averaging the net worth increase. Under the foregoing Findings of Fact and conclusions, the increase in petitioner's net worth as corrected will approximate $25,000 in 1960 and $58,000 in 1961, with a decrease of $1,250 in 1962. Petitioner contends that the Aggregate increase in net worth should be spread evenly over the three tax years in question - i.e., that the income be averaged. We disagree. Spreading the increase in net worth evenly over a period of years, without regard to the particular year in which it is reasonably probable that the unreported income was actually earned, would violate the annual accounting period concept upon which the tax laws are based. Cf. W. A. Shaw, 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958); Ehlers v. Vinal, 382 F. 2d 58, 65 fn. 12 (C.A. 8, 1967). Although such averaging may be proper where it is shown that the unreported income was earned in substantially equal amounts in the different years in issue, see United States v. Ridley, 120 F. Supp. 530, 533 (N.D. Ga. 1954), petitioner has made no such showing here. Quite to the contrary, the annual increases in petitioner's net *44 worth are based on acquisitions of individual, identifiable items of property which, in almost every instance, are keyed to precise dates. The principal sources of the income were petitioner's nightclub operations, and the amounts of his adjusted gross income reflect the extent of those operations. Thus, during 1960 his operations included Guys and Dolls from January through May and Frieda's Parisienne from September through December. During 1961, when his income was at its peak, he operated both Frieda's Parisienne and Chez Paree for the entire year. During 1962 he operated Chez Paree all the year and Frieda's Parisienne only during the month of December. These facts preclude a mathematical allocation of the income. Decision will be entered under Rule 50. 1367 Footnotes
1. Petitioner has not expressly conceded the allegation in the amendment to the answer that his net worth as of December 31, 1962, included $6,000 due on a receivable from Malcolm Faber. However, petitioner did not object to respondent's requested finding of fact to this effect, which we have made. The record shows that respondent has carried his burden on this issue.↩
2. Q. Mr. Robino, did you testify the day before yesterday that you didn't know how much cash you had on hand at January 1, '60? A. Yes, I did. Q.How is it that you have come up with this figure of fifty thousand dollars? A. Well, I had cash, I didn't know how much I had at the time, and last night my attorney and bookkeeper had a meeting at the house and we talked about the down payment I put on Park Island and the money I paid into 410 Bourbon.↩
3. Although petitioner does not expressly concede the point, we assume he would agree that, under his theory, his net worth as of December 31, 1962, would include the $10,000 note from Lindsey.↩
4. Q. Now, when did you leave that business, Mr. Lindsey? When did you physically leave? When did you get out of it? A. Oh, it was toward the end of '62. * * * Q. When you say the end, do you mean November or December? A. The end of '62 would be in December some time. * * *↩